Winfred BOOKER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–88–154.

Court of Criminal Appeals of Oklahoma.

April 15, 1993.

James O. Braly, Durant, Trial Counsel, Mark Barrett and William H. Luker, Asst. Appellate Public Defenders, Norman, Appellate Counsel for appellant.

Larry G. Grant, Bryan County Dist. Atty., Durant, Trial Counsel, Robert H. Henry, Atty. Gen. of Oklahoma and Wellon B. Poe, Asst. Atty. Gen., Oklahoma City, Appellate Counsel for appellee.

**OPINION**

CHAPEL, Judge:

Winfred Booker, appellant, was tried by jury and convicted of First Degree Felony Murder[1] (21 O.S.Supp.1982, § 701.7) in Bryan County District Court, Case No. CRF–87–325, before the Honorable Joe C. Taylor, District Judge. The jury found two (2) aggravating circumstances and sentenced appellant to death.[2] We reverse.

The body of James "Monk" Clement was discovered in the early morning hours of August 29, 1988, in the Caddo, Oklahoma, home of John Daily. The victim had been shot once in the chest with a shotgun.

At trial Mr. Dennis Battiest testified he and appellant spent the early evening hours of August 28, 1988, drinking beer. At approximately 7:30 p.m. on that date, Mr. Battiest gave appellant a ride to a location described as "the rock house" which is located two blocks from the home of John Daily.

Mr. Don Thornton, who lived approximately two blocks from John Daily, testified he saw the victim's pickup drive by his house at 11:00 p.m. on August 28, 1988. On direct examination, Mr. Thornton stated appellant was driving the pickup. However, on cross-examination the witness testified he was not sure who was driving the vehicle.

Rick Boydston testified he saw appellant sometime between the hours of 4 and 5 a.m. on August 29, 1988. Mr. Boydston gave appellant a ride from the junction of Lakeside Road and Highway 70 to the Holiday Inn in Durant.

B.J. Moore, an investigator for the Bryan County District Attorney's Office at the time the crime occurred, testified the victim's pickup was found on Streetman Road approximately twelve miles west of Durant and approximately one mile from Highway 70. The pickup was stuck in a ditch.

Appellant was arrested in McAlester, Oklahoma, and on September 2, 1988, he

---

1. The Information alleged that the death occurred during the commission of Robbery With a Firearm. (21 O.S.Supp.1982, § 801).

2. The jury found that the murder was especially heinous, atrocious or cruel and that appellant would constitute a continuing threat to society. *See* 21 O.S.1981, § 701.12(4) & (7), respectively.

was transported back to Durant. In Durant, appellant was taken to the office of B.J. Moore, located in the Bryan County Courthouse. Mr. Moore, Deputy Bob Wallace and Deputy Bob Culley were present in the office. Appellant was questioned by Moore while Deputy Wallace wrote down the statements.

Appellant stated he left the rock house and walked to John Daily's home intending to rob "Monk." Once at the Daily residence, appellant sat and drank beer with Mr. Daily and the victim for over an hour. The victim was sitting in a chair with a shotgun beside him. When the victim picked up the shotgun appellant grabbed the barrel and turned it around. Appellant admitted he then pulled the hammer back and shot the victim in the chest.[3] Appellant then took the victim's wallet and drove away in the victim's pickup. He threw the shotgun out the window of the pickup as he drove. Appellant next went to the Lakeside Club but could not get inside. Upon leaving the club, the pickup became stuck in a ditch and appellant then walked to Highway 70 and Streetman Road where he obtained a ride to Durant.

Apart from the confession, the only evidence directly linking appellant with the crime was the testimony of Gary Dean. Mr. Dean claimed appellant commented on the charges that he (appellant) was facing during a time the two shared a jail cell. During direct examination, Mr. Dean described appellant's altercation with the victim: "He [appellant] just said he went over to the guy's house and they was drinking and the guy pulled a gun on him and Winfred took the gun away from him and backed up and shot him." (Tr. 646). Dean testified appellant told him he removed the victim's wallet and left in the victim's truck.

Prior to opening statements, defense counsel filed a Motion to Suppress urging the trial court to exclude appellant's confession. Though the motion was overruled defense counsel reurged the motion several times during the trial. In his first assign-

ment of error, appellant claims the trial court erred in refusing to grant his motion to suppress the confession. We agree. Prior to questioning, appellant received the *Miranda* warnings. According to the report prepared by Deputy Wallace (State's Ex. 3 & 5), after appellant received the warnings the following occurred:

B.J. Moore asked Winfred Booker if he understood his rights and Winfred Booker stated "yes." B.J. Moore asked Winfred Booker if he wanted to talk to us and Winfred Booker stated that he would rather talk to a lawyer first. B.J. Moore then said "Then you don't want to clear this up right now" and Winfred Booker then asked "Clear what up?" B.J. Moore then stated "What your activities were Friday." Winfred Booker then stated "I guess I went up and shot Monk."

B.J. Moore then stated "You guess you went up and shot Monk" and Winfred Booker stated "I did go up and shoot Monk." At that point Winfred Booker started to talk about what happened. . . .

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held "[i]f [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444–445, 86 S.Ct. at 1612. This requirement, described as a "rigid" prophylactic rule, *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), was further explained in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). An accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," unless he validly waives his earlier request for the assistance of counsel. *Id.* at 484–485, 101 S.Ct. at 1885.

■ The State contends appellant's statement "was not an affirmative request for an attorney but was merely a state-

---

**3.** According to appellant's statement, Mr. Daily witnessed the shooting. Mr. Daily, presumably

due to a deteriorating mental condition, was not subpoenaed to testify.

ment made by the defendant." (State's Brief at 6). We disagree. We find appellant's response, "I would rather talk to a lawyer, first," is a clear and concise request for counsel that should have acted as a bar to further inquiry. We find equally unpersuasive the State's contention that Mr. Moore's subsequent statement, "[t]hen you don't want to clear this up right now," does not constitute interrogation but was only an attempt to clarify appellant's statement. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). We conclude Mr. Moore's inquiry was nothing more than a thinly veiled attempt to "dissuade the appellant from exercising his right to counsel." *White v. State*, 674 P.2d 31, 36 (Okl. Cr.1983).

Additionally, we find *Edwards, supra,* dispositive of the State's assertion that appellant waived his right to the presence of counsel. *Edwards* held "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484, 101 S.Ct. at 1884–1885.

In ruling upon the admissibility of the confession, the trial court relied, at least in part, upon the fact that several days after appellant confessed he agreed to accompany police in an effort to locate the murder weapon. Prior to overruling the Motion to Suppress at the close of the State's case, the trial judge stated:

> But then following [the interrogation] also, and I think probably has some importance, at least in viewing the decision of the defendant to go ahead and to make the admission, is the fact that a few days later and after appointment of counsel he took the officers to where he

says he threw the gun out and they looked for it.

(Tr. 666). This rationale was described in *Smith v. Illinois*, 469 U.S. 91, 97, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984), as "unprecedented and untenable." *Smith* held "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100, 105 S.Ct. at 495. Thus, we do not view appellant's subsequent comments to Mr. Moore or his later decision to aid officers in the search for the murder weapon as circumstances which minimize or make ambiguous his earlier request for counsel.

Appellant was asked if he wanted to talk to officers and responded that he would rather talk to a lawyer first. We find nothing indecisive or ambiguous about appellant's response. To conclude otherwise would encourage badgering or overreaching, explicit or subtle, designed to wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.

■ For the foregoing reasons, we find the admission of appellant's confession was error and must now decide if this error was, as the State alleges, "harmless." The State asserts any error concerning the admissibility of the confession was harmless because "sufficient other evidence was presented at trial to support the defendant's conviction." (State's Brief at 7). We disagree. To find an error harmless, we must be satisfied beyond a reasonable doubt that the error did not contribute to the conviction. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). After examining all of the evidence presented, save the confession, we are not persuaded beyond a reasonable doubt that appellant would have been convicted had the confession not been introduced.

Initially, we observe that a defendant's confession is often the most probative and damaging evidence against him. *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Excluding appellant's confession, the only evidence

directly linking appellant to the crime was the testimony of Gary Dean. The credibility of Mr. Dean was suspect. Dean admitted he originally volunteered the information "[b]ecause I thought it would help me." (Tr. 648). We realize issues of credibility are the province of the jury. However, we are unable to conclude, as we must to hold the error harmless, that the jury would have, without the corroborative effect of appellant's statement, found the testimony of Mr. Dean sufficient to convict appellant of First Degree Murder. *See Walker v. State*, 795 P.2d 1064, 1069 (Okl. Cr.1990).

Despite the fact that this case shall be reversed due to error occurring in the guilt/innocence stage of the trial, appellant's ninth proposition of error warrants discussion. Appellant correctly asserts that insufficient evidence was presented to support the heinous, atrocious or cruel aggravating circumstance. We review this proposition to eliminate any possibility silence will later be misconstrued as an affirmance of the jury's finding regarding this aggravator.

The prosecution is required to establish the existence of each aggravating circumstance alleged beyond a reasonable doubt. *See Oklahoma Uniform Jury Instruction–Criminal* (OUJI–CR) 435. A jury's finding that a murder was especially heinous, atrocious or cruel must be supported by competent evidence indicating the victim's death was preceded by torture or serious physical abuse. *Battenfield v. State*, 816 P.2d 555, 565 (Okl.Cr.1991). Although we have held "[t]orture may include the infliction of either great physical anguish or extreme mental cruelty," *see Berget v. State*, 824 P.2d 364, 373 (Okl.Cr. 1991), we find the evidence insufficient to support either finding here.

Testimony established that Dr. Rao Sureddi arrived at the crime scene at 4:15 a.m. on August 29th, and examined the body of the victim. Dr. Sureddi admitted he could not fix an exact time of death, but when asked to render an opinion the doctor "guessed" the victim died not more than six hours prior to his examination. Assuming the victim was shot immediately prior to the 11:00 p.m. August 28th sighting of the victim's pickup by Mr. Thornton, Dr. Sureddi's testimony is as consistent with instantaneous death as any other possibility. Nor do we find under the facts of this case, the type of extreme mental cruelty discussed in *Berget, supra.* The record does not support a finding of mental anguish beyond that which necessarily accompanied the underlying killing. Accordingly, we find the evidence presented was insufficient to establish that the murder was especially heinous, atrocious or cruel.

As a result of the error identified in the guilt/innocence stage of the trial, this case is **REVERSED** and **REMANDED** for **NEW TRIAL.**

JOHNSON, V.P.J., and LANE, J., concur.

LUMPKIN, P.J., concurs in part/dissents in part.

LUMPKIN, Presiding Judge, concurring in part/dissenting in part:

I concur in the Court's determination that the confession given by Appellant on August 2, 1987, was not admissible and should have been suppressed at trial. Initially, I found merit in the State's brief and argument that the Appellant's response "I would rather talk to a lawyer first", could have been taken as an equivocal, ambiguous statement which could warrant further inquiry to clear up the ambiguity. However, a reading of the transcript of proceedings on the Motion to Suppress (Vol. III, Pgs. 446–523) makes it very clear the officers accepted Appellant's response as a clear, unequivocal request for an attorney. The Appellant and the officers were getting up to leave the room after the request for counsel when Mr. Moore then made the statement which caused the Appellant to respond and admit the crime. When read in context, it is apparent the conduct was the type of action which was prohibited in *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), and addressed by this Court in

*White v. State*, 674 P.2d 31, 36 (Okl.Cr. 1983). The Court has appropriately set forth the legal standards which must be applied in this type of case, and the record dictates the result reached. However, I must dissent to the Court's decision that the admission was not harmless error in accordance with the analysis pursuant to *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When the testimony of Gary Dean is reviewed in conjunction with the circumstantial evidence presented to the jury, it is readily apparent the admission of the testimony is harmless error beyond a reasonable doubt. Therefore, I would affirm the conviction of Murder, First Degree.

I also agree with the Court that the evidence submitted to the jury does not support the aggravating circumstance of especially heinous, atrocious or cruel. The record reveals the victim died from a single shotgun wound to the chest. The medical examiners testimony does not support any theory other than instantaneous death. This fact situation cannot support a finding of torture or serious physical abuse. Therefore, I agree the case must be remanded, but only for resentencing.